**Jonathan Mark HART, Appellant,**

v.

**STATE of Texas, Appellee.**

**Nos. 11–07–00163–CR, 11–07–00164–CR, 11–07–00165–CR.**

Court of Appeals of Texas, Eastland.

July 31, 2008.

Discretionary Review Refused Nov. 26, 2008.

Tim Copeland, Abilene, TX, for Appellant.

Russell D. Thomason, Dist. Atty., Brenda Seale Gray, Sarah M. Adams, Asst. Dist. Attorney's Office, Eastland, TX, for Appellee.

Panel consists of: WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

TERRY McCALL, Justice.

This is an appeal from a judgment revoking Jonathan Mark Hart's community supervision in three cases. In 1999, following a jury trial, Hart was convicted of three separate second degree sexual assault offenses involving three different minor victims in Cause Nos. 19,440, 19,451, and 19,457. Pursuant to the jury's verdict, he was sentenced to three separate ten-year terms of confinement in the Texas Department of Criminal Justice, Institutional Division. On the jury's recommendation, the trial court suspended the imposition of each sentence and placed Hart on community supervision for ten years for each offense. In 2006, the State filed a motion to revoke community supervision, alleging ten violations. After the hearing, the trial court announced that it found that Hart had committed the ten violations, revoked Hart's community supervision, and entered judgment sentencing Hart to ten years confinement in each case, running concurrently.

In Hart's first issue, he asserts that the community supervision conditions that he allegedly violated amounted to unconstitutional restrictions on Hart's freedom of religion. In Hart's second issue, he asserts that the evidence was insufficient to support the findings of true by the trial court. We affirm.

### Standard of Review

The State has the burden of showing by a preponderance of the evidence that the defendant committed a violation of the conditions of community supervision. *Cobb v. State,* 851 S.W.2d 871, 873 (Tex.Crim.App.1993); *Kulhanek v. State,* 587 S.W.2d 424, 426 (Tex.Crim.App. 1979). The trial court's order revoking community supervision is reviewed under an abuse of discretion standard. *Rickels v. State,* 202 S.W.3d 759, 763 (Tex.Crim. App.2006); *Cardona v. State,* 665 S.W.2d 492, 493 (Tex.Crim.App.1984). The trial court is the sole judge of the credibility of the witnesses and the weight given to their testimony, and the evidence is reviewed in the light most favorable to the trial court's ruling. *Cardona,* 665 S.W.2d at 493; *Garrett v. State,* 619 S.W.2d 172, 174 (Tex. Crim.App.1981). If the State fails to meet

its burden of proof, the trial court abuses its discretion in revoking the community supervision. *Cardona,* 665 S.W.2d at 493–94. Proof by a preponderance of the evidence of any one of the alleged violations of the conditions of supervision is sufficient to support a revocation order. TEX.CODE CRIM. PROC. ANN. art. 42.12, § 21(b) (Vernon Supp.2007); *Moore v. State,* 605 S.W.2d 924, 926 (Tex.Crim.App.1980); *Leach v. State,* 170 S.W.3d 669, 672 (Tex. App.–Fort Worth 2005, pet. ref'd).

■ A claim of insufficient evidence is limited to the traditional legal sufficiency analysis that requires us to view the evidence in the light most favorable to the decision to revoke; it does not extend to a factual sufficiency review. *Becker v. State,* 33 S.W.3d 64, 66 (Tex.App.–El Paso 2000, no pet.); *Joseph v. State,* 3 S.W.3d 627, 642 (Tex.App.–Houston [14th Dist.] 1999, no pet.); *Johnson v. State,* 2 S.W.3d 685, 687 (Tex.App.–Fort Worth 1999, no pet.).

### *Background*

Hart's sexual assault offenses involved teenage girls in Eastland where Hart was a church youth minister. Shortly after his convictions, Hart's community supervision was transferred from Eastland to Henderson County. Hart's alleged violations occurred in 2006. The director of the Henderson County Community Supervisions and Corrections Department, Ty Choate, testified at the hearing that his department had implemented a new system for sex offenders to better enforce the conditions of community supervision, protect the community, and address the needs of the sex offender. Hart was assigned a different sex offender therapist and placed on more intensive supervision. Shortly after Choate implemented the new program, Hart requested a meeting with Choate to voice his complaints that the program was overly restrictive, that the sex offender therapist had singled him out, and that he was not being treated fairly. Choate investigated Hart's complaints and found that Hart "was being treated exactly the same way as every other offender" going through the program. Hart continued to have conflicts with his sex therapist and his community supervision officer and had additional visits with Choate.

In its motion to revoke Hart's community supervision, the State alleged that Hart had violated Condition No. 5 of his community supervision by failing to report in person on February 2, 2006, at 3:00 p.m. and September 12, 2006, at 4:30 p.m.

The State also alleged that Hart had violated Condition No. 34 of his community supervision (under section "IV. Sex Offender Conditions") by failing to abide by all rules and regulations of the sex offender treatment program, by failing to be responsible for any costs of the program, and by being discharged from the program on December 14, 2006. Condition No. 34 required Hart to attend and participate in a sex offender program; to participate in psychological, psychiatric, and psychophysiological testing and report for clinical polygraph examinations as directed by the therapist; to abide by all rules and regulations of the program; and to be responsible for any costs of the program. The State further alleged that Hart had admitted to the community supervision officer on October 11, 2006, that he had not been honest during the polygraph examination on that day with the polygraph examiner.

Hart's conditions of community supervision had originally omitted Condition No. 35; however, after Hart was placed on community supervision on February 24, 1999, the court amended Hart's community supervision order on April 26, 1999, by adding Condition No. 35. That amendment stated that Hart was to have no unsupervised contact with children under

the age of seventeen and that he was not to frequent, remain about, or enter any place where children under the age of seventeen congregate. Subsequently, on May 18, 2006, Hart's community supervision officer requested that Condition No. 35 be further amended as follows, which request was granted:

> Have no unsupervised contact with children under the age of seventeen. Do not frequent, remain about, or enter any place where children under the age of seventeen congregate, excepting the United Pentecostal Church, located at 101 McArthur, Athens, Henderson County, Texas, 75751 for regularly scheduled services only on Sundays from 11:00 a.m. to 12:00 p.m., and 6:00 p.m. to 7:00 p.m. and Wednesdays from 7:30 p.m. to 8:30 p.m. In addition, Defendant is to only attend when at least one of his approved chaperones is present and gives a signed statement to the supervision officer stating whether or not Defendant had any contact with children under the age of seventeen years and providing the details of that contact. Further, Defendant is restricted to the main auditorium or sanctuary and is prohibited from youth groups, Sunday school rooms, or any other part of the church buildings or property where children under the age of seventeen years congregate.

The State alleged five violations of the amended Condition No. 35.

### Hart's First Issue

■■■ In Hart's first issue, he argues that the amended conditions imposed by the trial court on May 18, 2006, were invalid as they constituted a violation of Hart's right to freely exercise his religious beliefs. Hart did not make this argument to the trial court, and it has been waived. To preserve error, there must be a timely, specific request, objection, or motion. TEX.

R.APP. P. 33.1. Even constitutional errors may be waived by failure to raise the issue to the trial court. *Briggs v. State,* 789 S.W.2d 918 (Tex.Crim.App.1990); *Smith v. State,* 721 S.W.2d 844 (Tex.Crim.App. 1986). Hart failed to make this objection to the trial court. Hart's first issue is overruled.

We further note that the State only had to prove one violation of the community supervision conditions. Even if Hart had preserved this issue and assuming his success in this argument, the State proved other violations that support the revocation order.

### Hart's Second Issue

■■■ In Hart's second issue, he argues that the trial court abused its discretion in revoking Hart's community supervision because the cause for revocation was not established by the evidence. We disagree. There is evidence that Hart failed to report as directed and that he violated Condition Nos. 34 and 35.

Hart's community supervision officer, Donna Ward, testified that Hart had been difficult to supervise and noncompliant with the program requirements for sex offenders. Ward supervised the sex offenders for the Henderson County Community Supervision and Corrections Department. Ward stated that the community supervision records reflected that Hart's prior community supervision officer also had concerns about Hart. On one occasion, Hart had been given permission to visit his grandmother in Eastland but had gone to see his in-laws who lived across the street from one of his earlier victims. Also, that community supervision officer documented concerns and conversations with Hart about his taking a position of authority or trust in a church, his being a pastor and counseling

female members, and his feelings of power through positions in a church. Hart changed churches two or three times and started his own church on one occasion. Ward became his community supervision officer in January 2005.

Ward testified that Hart had failed to report at 4:30 p.m. on September 12, 2006, but that Hart had appeared at 4:55 p.m. and that she rescheduled the appointment. Ward also testified that Hart had failed to report as directed on February 2, 2006, at 3:00 p.m. and that later he was given an appointment for February 24. Hart does not dispute the violations but argues that these were not violations because he made up the appointments. The missed appointments were violations. Their significance in this case was that they were indications that Hart did not want to cooperate with the new sex therapy treatment program. Ward started Hart back into intensive sex offender counseling on September 7, 2005, after he had failed his polygraph exam and made admissions after the exam.

The State also alleged that Hart failed to abide by all rules and regulations of the sex offender treatment program, failed to be responsible for costs of the program, and was discharged from the program on December 14, 2006, as being unsuccessful. Brack Dempsey, Hart's community supervision officer in Eastland and the custodian of records for sex offender cases, introduced Hart's records. Dempsey stated that he had received a letter from the Henderson County sex therapist advising him that Hart had been discharged from the sex offender treatment program for failing polygraphs, being dishonest about grooming behaviors, grooming a particular fifteen-year-old girl in his church, having fantasies about another woman and the fifteen-year-old girl while having sex with his wife, and being dishonest with his counselor. Because of the violations and

lack of progress by Hart reflected in the records, Dempsey expressed his opinion that Hart was a significant risk to society and that he would be very concerned if Hart "were returned to supervision with anything less than an extension for further treatment." Dempsey further expressed his doubt that Hart would receive any benefit from further therapy.

During cross-examination, Dempsey agreed that the records reflected that Hart had apparently made progress under his previous sex therapist, John C. Motley, and that the more negative reports on Hart began almost immediately after Motley was replaced by the new therapist, Linda Young. On redirect examination, Dempsey stated that the records reflected that Hart had only volunteered information that he was grooming a fifteen year old in church after he was caught being deceptive on the polygraphs. Dempsey also stated that Motley had learned that Hart had lied to him. Hart had been adamant to Motley that he had had sexual contact with no one but his wife since being on community supervision; however, Hart later admitted to Motley that he had, in fact, had sexual contact with someone he worked with. In discussing a failed polygraph with Motley, Hart admitted that a twenty-year-old woman at his place of employment had performed oral sex on him in his van.

Linda Young testified that she was a licensed sex offender treatment provider and had been counseling for sixteen or seventeen years. She first met Hart in November 2005. Young testified that initially Hart had a difficult time accepting responsibility for the three sexual assaults for which he was convicted, blaming the victims, society, and the way women dress. She stated that it was unusual that Hart did not have empathy for his victims because, after seven years of therapy, an

offender should be taking responsibility for his actions and be able to identify how they had harmed the victim and the family. Young did a biopsychosocial assessment of Hart that showed that Hart had begun using pornography when he was thirteen or fourteen and became "hooked" on it. Based on the overall assessment, Young concluded that Hart was "very much at risk" and noted:

> His denial is pervasive. He is involved with an unsuspecting church and continuing to becoming more visible within the church. He failed his last polygraph. His thinking is very concrete and similar to that of a pedophile. He can manipulate chaperone[s] and has access to multitudes of potential victims. My recommendations are Mr. Hart, his church leaders and his wife have an immediate meeting with probation and myself. We will go from there.

Young testified that she did meet with church members. She was concerned with Hart's "good-guy thinking error" where a person comes across as very caring, supportive, empathetic. Young stated that that situation was quite dangerous for someone who has a problem with sexual offenses, especially in a church setting. Even though she advised the church members, Young believed that they did not take her seriously enough to supervise Hart as they should have.

Young stated that, after failing a polygraph, Hart had admitted to his group that he had been having thoughts and fantasies about another adolescent female and that he admitted to grooming that female. After that admission, Young told Hart that she did not want him to return to church "until we could resolve this and figure out what we needed to do." However, Hart did go back to church and lied to her about doing so. Young described Hart as being very charismatic, quite likeable, and good

at making people believe that he was harmless. In her opinion, Hart was a risk because he was a sex offender who minimized and lied to himself, continued to put himself at risk where he could potentially re-offend, and did not acknowledge to himself that he put himself at risk.

Hart argues that the record shows that there were only two overt acts at the church involving the fifteen year old. Hart had put a sticky note on the back of a woman sitting in front of him at church. The woman walked to the front of the church, and the fifteen-year-old female took the sticky note off. Hart went to the girl and asked her why she took the sticky note off, and they laughed and conversed about it. On another occasion, Hart shook hands with the fifteen year old. Hart argues that those two brief encounters cannot be considered grooming.

Although those were brief contacts, the reports reflect that Hart admitted to his group that "he ha[d] been grooming a potential victim in church and fantasizing regarding his victim." The fifteen year old reminded him of one of his victims in Eastland because she was "really built" and wore "tight-fitted clothes." In the September 27, 2006 report, Hart stated that he seldom went to church because he had realized he truly was back in his cycle; that he was grooming the girl; that he was disappointed in himself; and that, although he would not re-offend, he "was a short distance from re-offending. The girl I was noticing and making the comments about her clothes, mannerisms, voice, et cetera, could have been my next potential victim." Hart also admitted to having sexual thoughts about the fifteen year old while having sex with his wife. Hart's admissions, made after being in therapy for seven years and usually made only after failing polygraph examinations, deeply concerned Young. Young emphasized

that, while treatment stresses the warning signs and inappropriate and dangerous behavior, Hart was allowing himself to go near his "fantasy." That put him in a very dangerous spot. Hart talked to his group about how he was grooming the girl.

Young stated that she did not like to discharge anyone from the group counseling and that she wanted everyone to succeed. However, Young finally concluded that Hart was not willing to give up his deviant behavior in order to do what it would take to make progress.

Hart's community supervision officer, Ward, confirmed Young's assessment of Hart's propensity to re-offend. Ward and Hart discussed his various fantasies and failures to make disclosures until after he had failed the polygraph tests. She admonished Hart after he admitted that he had engaged in conversation with the fifteen-year-old girl, who reminded him of one of his previous victims, and that he had started secret sharing with the girl. Ward also related a conversation with the mother of the fifteen-year-old girl where Ward was told that Hart had asked the girl and her younger brother to go on his paper route with him one night without any supervision and that the mother would not allow them to go with Hart.

Choate, the director who implemented the new sex offender program, agreed with the assessments of Hart by Ward and Young. Choate testified that Hart "was being very noncompliant, argumentative and just not willing to follow the steps of the counseling program." Choate expressed his opinion that Hart was not being honest with the department, himself, or the therapy program.

Hart argues that Young was biased against him, telling him that "he just pissed [her] off," that Young did not know how Hart lived with himself, and that she did not know how his wife could stay with

him. Young admitted that she may have made such statements to Hart and gave the following explanation:

Sex offender therapy is very confrontative [sic] by nature because of denial.... It's impossible to be gentle and subtle with these folks because they will see that as an opportunity to manipulate. Their denial is so great. It's a way to get through that denial at times. Mr. Hart was greatly offended that I said these things, which kind of shows you where he was at in treatment.

Hart's other argument is that the revocation was based on his thoughts and that there was no physical action that would warrant revocation. Hart's witnesses included the mother of the fifteen-year-old girl, who stated that she was not concerned about her daughter's safety because she was watching Hart. Various other members of the church testified that there was no inappropriate or unsupervised contact between Hart and the girl, that Hart was always within sight of a chaperone, and that Hart never acted inappropriately at church.

Condition No. 34 required Hart to attend and participate in the sex offender program approved by the trial court and to abide by all rules and regulations of the program. Hart has confused an appearance of participating in a sex offender program and abiding by its rules and regulations with a sincere and good faith participation in the program. Condition No. 34 contemplates that Hart would make a sincere and good faith effort to participate in the sex offender program to overcome his problem of sexual attraction to fifteen-year-old girls. There is substantial evidence that Hart did not make that sincere and good faith effort to change his behavior, and it is not surprising that the Henderson County community supervision officers discharged Hart from their sex

treatment program. The problems became evident even to Hart's first community supervision officer and to Motley, his first sex therapist.

Ward testified that Hart told her what she wanted to hear but that his actions showed that he was not sincere. Young testified that Hart was not sincere in trying to overcome his problem: he only followed the rules (when he did) because he had to. Choate testified that Motley, the previous therapist, had problems with Hart during the last few months of Motley's supervision. Also, the record reflected that Motley was extremely concerned that there had been a change in Hart's belief structure, habits, and practices toward the end of the time that Motley was the therapist with Hart. According to Ward, Hart's previous community supervision officer also had concerns about Hart.

The evidence was sufficient to support a finding that Hart violated Condition No. 34. There was also evidence that Hart violated Condition No. 35. For example, Hart did not give a written statement to his community supervision officer about the two contacts he had with the fifteen-year-old girl in the church as required by Condition No. 35. Instigating the conversation with the girl was also a violation that was not disputed. Hart's only defense was that these contacts did not appear to be inappropriate. Those conditions had nothing to do with his freedom to worship. Hart's second issue is overruled.

 Trial courts possess broad discretion over defendants who are placed on community supervision. TEX.CODE CRIM. PROC. ANN. art. 42.12 (Vernon Supp.2007); *Becker*, 33 S.W.3d at 66. This degree of discretion extends to revocation proceedings; the trial court has considerable discretion to modify, revoke, or continue the community supervision. *See* Article 42.12,

section 21(b); *Ex parte Tarver*, 725 S.W.2d 195, 200 (Tex.Crim.App.1986); *Flournoy v. State*, 589 S.W.2d 705, 707 (Tex.Crim.App. 1979); *Becker*, 33 S.W.3d at 66. The trial court did not abuse its discretion in revoking Hart's community supervision in the three cases.

*This Court's Ruling*

The judgments of the trial court are affirmed.