# NO. 12-20-00020-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *JEREMY ALLEN MATHIS,*<br>*APPELLANT* | *§* | *APPEAL FROM THE 349TH* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | *§* | *ANDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Jeremy Allen Mathis appeals the revocation of his community supervision. In two issues, Appellant contends the evidence is insufficient to support his revocation and that the trial court improperly authorized attorney's fees to be added at a later date. We modify the judgment and affirm as modified.

## BACKGROUND

In 2015, Appellant was charged by indictment with fraudulent use or possession of identifying information and abandoning or endangering a child. Pursuant to a plea agreement, Appellant pleaded "guilty" to both charges and was placed on deferred adjudication community supervision for four years.

In December 2018, the State filed a motion to proceed with adjudication of guilt and sentencing alleging Appellant violated certain terms of his community supervision. Specifically, the State maintained that Appellant committed three new offenses, which were alleged in a new indictment. Appellant was charged with two counts of assault family violence with a previous conviction as well as injury to a child. The State's motion further alleged Appellant failed to pay the costs of urinalysis drug tests, supervision fees, and his fine.

Appellant pleaded "not guilty" to the charges alleged in the new indictment, and the matter proceeded to a jury trial. Appellant also pleaded "not true" to the motion to proceed with adjudication. The new offenses and the motion to adjudicate were heard simultaneously by the jury and trial court. At the conclusion of the trial, the jury found Appellant "not guilty" of the offenses as alleged in the indictment. However, the trial court found that Appellant had committed them by a preponderance of the evidence, found the State's allegations to be "true," revoked Appellant's community supervision, and sentenced him to two years confinement. This appeal followed.

## REVOCATION OF COMMUNITY SUPERVISION

In his first issue, Appellant contends the evidence is insufficient to support the trial court's revocation of his community supervision. Specifically, Appellant urges the evidence is insufficient to support the trial court's finding that he committed the criminal acts alleged.

### Standard of Review and Applicable Law

The determination to proceed with an adjudication of guilt after a defendant is placed on deferred adjudication community supervision is reviewable in the same manner as a revocation hearing. TEX. CODE CRIM. PROC. ANN. art. 42A.108(b) (West 2018). In revocation cases, the state has the burden to establish by a preponderance of the evidence that the terms and conditions of community supervision have been violated. *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984). The preponderance of the evidence standard is met when the greater weight of the credible evidence before the trial court supports a reasonable belief that a condition of community supervision has been violated. *Rickels v. State*, 202 S.W.3d 759, 764 (Tex. Crim. App. 2006). In a hearing on a motion to revoke community supervision, the trial court is the sole trier of fact, and the judge of the credibility of the witnesses and the weight to be given their testimony. *Taylor v. State*, 604 S.W.2d 175, 179 (Tex. Crim. App. [Panel Op.] 1980).

When the state has met its burden of proof and no procedural obstacle is raised, the decision whether to revoke community supervision is within the discretion of the trial court. *Flournoy v. State*, 589 S.W.2d 705, 708 (Tex. Crim. App. [Panel Op.] 1979). Thus, our review of the trial court's order revoking community supervision is limited to determining whether the trial court abused its discretion. *Caddell v. State*, 605 S.W.2d 275, 277 (Tex. Crim. App. [Panel Op.] 1980). If there is some evidence to support the finding of even a single violation, the

2

revocation order must be upheld. *See* ***Hart v. State***, 264 S.W.3d 364, 367 (Tex. App.–Eastland 2008, pet. ref'd); ***Cochran v. State***, 78 S.W.3d 20, 28 (Tex. App.–Tyler 2002, no pet.) (citing ***Moore v. State***, 605 S.W.2d 924, 926 (Tex. Crim. App. [Panel Op.] 1980)).

A person commits the offense of assault, as applicable in this case, if he intentionally, knowingly, or recklessly causes bodily injury to another. TEX. PENAL CODE ANN. § 22.01(a)(1) (West 2020). A person commits the offense of injury to a child if he intentionally, knowingly, recklessly, or with criminal negligence, by act causes to a child bodily injury. *Id.* § 22.04(a)(3) (West 2019). "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(8) (West Supp. 2020)

**Analysis**

In its motion to adjudicate, the State alleged Appellant violated the following terms of his community supervision: (1) committing injury to a child on November 28, 2018; (2) committing assault family violence against Rhonda Mathis on November 28, 2018, with a previous conviction; (3) committing assault family violence against Alexis Mars on November 28, 2018, with a previous conviction; (4) failing to pay for urinalysis drug tests; (5) failing to make his monthly supervision payment over several months; and (6) failing to pay his previous fine per the collections agreement. Appellant claims the evidence does not support the allegations that he committed the crimes alleged.

Shakia Price testified that she saw Appellant fighting with a woman in a van in the Palestine Walmart parking lot on November 28, 2018. His hands were around the woman's neck. A female child was attempting to stop Appellant. Price yelled at Appellant, "Don't do that. Get off of her." She then called 911. According to Price, it appeared Appellant was choking the woman because of the way he was holding the woman and the way the woman was trying to get him to let go. Price further testified that the woman's face was red and she appeared to be gasping for air. Appellant eventually stopped and left the scene on an electric scooter.

Chrystian Calhoun, who was ten years old at the time of trial, testified that his mother had asked him to go into Walmart to get something on November 28. When he exited the store, he heard people arguing, and then he "saw [Appellant] punch the girl in the stomach. She flew out of the car." Calhoun ran to tell his mother who told him to stay in the car.

Tanesha Strain, Calhoun's mother, testified that when Calhoun returned from inside the store, he told her that a man hit a little girl. Strain made Calhoun get in the car, and then went to

3

help. She recognized the people involved. According to Strain, Rhonda was screaming, "Help, help, get your hands off of me." Appellant had Rhonda behind the back of her head. Appellant was in the driver's seat of a car and Rhonda was in the passenger's seat. Strain approached Appellant and said, "Hey, if you want to hit somebody, hit me." Strain stated that she was angry because the little girl was out of the car and holding her stomach. She then saw "the mom" exit Walmart and Strain told her what happened. By that time, the police arrived, and Strain gave a statement.

Zachary Smith, an officer with Palestine Police Department, testified that he responded to a disturbance at the Walmart parking lot on November 28. During his investigation, he determined there were two alleged assault victims. Alexis claimed she was punched and fell out of the vehicle, approximately eighteen inches from the ground. Rhonda alleged that Appellant grabbed her behind the neck leaving scratch marks. Photographs of their injuries were admitted into evidence. Appellant was not on scene, but he was found nearby between a gas station and a Wendy's restaurant.

Rhonda Mathis testified that she is Appellant's mother. According to Rhonda, in November 2018, Appellant was dating a woman named Misty and Alexis was her daughter. On the day of the incident, the family had gone to Walmart. Misty went into the store while everyone else stayed in the van. Rhonda testified that the incident between Appellant, Alexis, and herself occurred as follows:

> A. Well, we were just sitting there, and she asked for her brush. And I told her it was in the console, to get it. She took -- Jeremy took the brush and threw it on top of the car.
> Q. For some reason he didn't want her to have the brush?
> A. He said that she was going to hit her brother with it.
> Q. Did [she] threaten to hit her brother with it or anything like that?
> A. No -- I don't remember, really.
> Q. Well, what happened after he put the brush up on top of the roof?
> A. She went out to get it, and he tapped on her leg, like that. (Demonstrating)
> Q. So he just tapped her?
> A. Uh-huh, like that. (Demonstrating)
> Q. He didn't hit her?
> A. No, he tapped her.
> . . .
> Q. So then what happened after he tapped her on her leg?
> A. She got back in the car and got in the backseat and was texting her mama from right there, and they -- they were having mouths, you know. And he just got tired and opened the front door and then came -- well, I was sitting right behind him. And he grabbed me like that trying to get to her. (Demonstrating)
> Q. Okay. You didn't put yourself in between the two of them to try and stop him from getting to her?

4

A. Yes.
Q. Then what happened?
A. Then the police came.
Q. So do you have -- you put your hand around the front of your neck. Did you ever tell the police that he grabbed you from the back of the neck?
A. Huh-huh.
Q. Never told the police that?
A. No, not the back.
. . .
Q. So he did injure you when he grabbed you around your neck?
A. It didn't hurt, but it did scratch my neck.

Rhonda also testified that Alexis stepped out of the van and did not fall out.

Alexis testified that she, her two brothers, her mother, Appellant, and Rhonda went to Walmart in November 2018 in Rhonda's vehicle. Only Alexis's mother went into the store while everyone else stayed in the car. When asked what happened on the day in question, Alexis answered as follows:

A. Me and my brother were playing, and I wanted my hair brush out of the front, and I asked if I could get it, and my grandma told me, "Yes," to get it.
Q. So you said you and your brother were playing. Were you fighting or...
A. No, sir.
Q. Why did you need the brush?
A. Because he was brushing my hair with his fingers and I had a hair brush, so I was going to get it and then --
Q. Was your hair kind of knotty that day?
A. (Moving head up and down.)
Q. You are shaking your head, is that a yes?
A. Yes, sir.
Q. Okay. She can only take down "yes," "no," verbal answers, that's why. You are not in trouble. So you asked for the hairbrush. Who did you ask for it?
A. My grandma.
Q. And what did she say?
A. She said, "Yes."
Q. Then what happened?
A. When I went to get it, [Appellant] took it and threw it on top of the car. And then my grandma told me to get the – get it off the top of the car. And when I opened the door, he punched me in my leg.
Q. Who is "he"?
A. [Appellant].
Q. [Appellant] punched you?
A. (Moving head up and down.)
. . .
Q. So you were reaching for it and then [Appellant] hit you?
A. Yes, sir.
Q. How did he hit you?
A. He just made a fist and hit me in my leg.
Q. Made a fist. So did it hurt?
A. (Moving head from side to side.)

5

Q. Yes or no?
A. No, sir.
Q. Did you get a bruise off of it?
A. A little one.
Q. A little bruise from it. So it had to heal up from that bruise; right?
A. Yes, sir.
Q. Did you fall -- when you got hit, were you able to get the brush or what happened?
A. I didn't get it. I just, like, lost my balance and then I fell.
Q. So you fell. How did you fall?
A. I fell on my bottom.

And when asked about the interaction between Appellant and Rhonda, Alexis stated:

A. He tried to grab me, and then my grandma, like, got in between us, and he grabbed her and left a mark like right here. (Pointing)
Q. Left a mark on her neck.

Photographs of Alexis's bruise were also admitted into evidence.

Appellant asserts there is insufficient evidence of bodily injury for either assault family violence or injury to a child. Specifically, he urges that because the alleged victims claim they experienced no pain that no bodily injury occurred. Both offenses require that the State prove, by a preponderance of the evidence in a revocation proceeding, that Appellant caused the victims' bodily injury. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.04(a)(3). "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(8). Evidence of scratches, cuts, and bruises can be sufficient evidence of bodily injury. *See **Bolton v. State***, 619 S.W.2d 166, 167 (Tex. Crim. App. 1981); ***Arzaga v. State***, 86 S.W.3d 767, 778 (Tex. App.—El Paso 2002, no pet.); ***Isaac v. State***, No. 05-10-00492-CR, 2011 WL 5386371, at *3 (Tex. App.—Dallas Nov. 9, 2011, no pet.) (mem. op., not designated for publication).

Based on the evidence at trial, the trial court could have reasonably concluded that both Alexis Mars and Rhonda Mathis suffered bodily injury. *See* TEX. PENAL CODE ANN. § 1.07(8). The evidence showed that Alexis suffered a bruise after being hit by Appellant and that Appellant scratched Rhonda's neck. Such evidence is sufficient to support a finding of bodily injury. *See **Arzaga***, 86 S.W.3d at 778. Accordingly, the trial court could have reasonably found, by a preponderance of the evidence, that Appellant committed the offenses of assault family violence and injury to a child. *See* TEX. PENAL CODE ANN. §§ 21.01(a)(1), 22.04(a)(3); *see also*

6

***Simpson v. State***, 591 S.W.3d 571, 575 (Tex. Crim. App. 2020) (recognizing that burden of proof in a revocation proceeding is lower than in a criminal trial). We overrule Appellant's first issue.

## ATTORNEY'S FEES ASSESSMENT

In his second issue, Appellant contends that the portion of the district clerk's certified bill of costs stating that "court appointed attorney fees may be added at a later date" is erroneous and should be deleted. The State has joined in Appellant's request.

### Standard of Review and Applicable Law

Article 26.05(g) of the Texas Code of Criminal Procedure provides trial courts with discretionary authority to order reimbursement of appointed attorney's fees when the defendant has financial resources that enable him to offset in part or in whole the costs of the legal services provided. TEX. CODE CRIM. PROC. ANN. art 26.05(g) (West Supp. 2020). However, a defendant who is determined by the court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." ***Id.*** art. 26.04(p) (West Supp. 2020); *see **Fulmer v. State***, 401 S.W.3d 305, 318–19 (Tex. App.—San Antonio 2013, pet. ref'd) (holding the trial court erred in ordering an indigent criminal defendant to pay court appointed attorney's fees when there was no evidence of a material change in his financial circumstances).

If a criminal action is appealed, an officer of the court shall certify and sign a bill of costs stating the costs that have accrued and send the bill of costs to the appellate court. *See* TEX. CODE CRIM. PROC. ANN. art. 103.006 (West 2018). The Texas Court of Criminal Appeals has stated that "attorney's fees as set forth in a certified bill of costs are effective whether or not incorporated by reference in the written judgment." ***Armstrong v. State***, 340 S.W.3d 759, 767 (Tex. Crim. App. 2011).

### Discussion

Here, the trial court determined that Appellant was indigent and appointed trial counsel to represent him. No evidence was presented regarding any change in Appellant's financial circumstances throughout the proceedings. The trial court also appointed counsel to represent him in this appeal. Accordingly, based on this record, there was no evidence to show that

Appellant's finances had undergone a "material change." *See* TEX. CODE CRIM. PROC. ANN. art. 26.04(p); ***Mayer v. State***, 309 S.W.3d 552, 557 (Tex. Crim. App. 2010).

Ordinarily in such circumstances, the appropriate remedy is to delete any assessment of attorney's fees in the trial court's judgment and the certified bill of costs. *See* ***Green v. State***, No. 04–13–00018–CR, 2013 WL 6200328, at *2 (Tex. App.—San Antonio Nov. 27, 2013, no pet.) (mem. op., not designated for publication) (modifying both judgment and bill of costs to delete assessment of attorney's fees against indigent criminal defendant). Here, neither the trial court in its judgment nor the district clerk in the certified bill of costs expressly orders that Appellant pay a specified amount of court appointed attorney's fees. However, the certified bill of costs contains the statement that "court appointed attorney fees may be added at a later date." As we have stated, attorney's fees as set forth in a certified bill of costs are effective even if not incorporated in the written judgment. *See* ***Armstrong***, 340 S.W.3d at 767. We are required to delete a statement in a certified bill of costs authorizing the assessment of attorney's fees at a later date when unsupported by evidence of a material change in financial circumstances. *See, e.g.*, ***Rosales-Ayala v. State***, No. 04-15-00226-CR, 2016 WL 527332, at *1 (Tex. App.—San Antonio Feb. 10, 2016, no pet.) (mem. op., not designated for publication) (deleting assessment of attorney's fees from certified bill of costs in an amount "to be determined" where trial court did not order defendant to pay fees for appointed counsel and no evidence presented of any material change in financial circumstances); *see also* ***Benavidez v. State***, 423 S.W.3d 520, 522 (Tex. App.—San Antonio 2014, no pet.) (deleting assessment of attorney's fees of $2,000.00 in certified bill of costs even though trial court did not expressly assess attorney's fees against defendant, because fees in certified bill of costs are effective whether or not incorporated by reference in written judgment).

Because the statement in the district clerk's certified bill of costs stating that "court appointed attorney fees may be added at a later date" is erroneous and unsupported by any material change in Appellant's financial circumstances, it must be corrected to delete that language. *See* ***Rosales-Ayala,*** 2016 WL 527332, at *1-*2. Appellant's second issue is sustained.

## DISPOSITION

Having overruled Appellant's first issue and sustained his second issue, we ***modify*** the trial court's judgment to indicate that court appointed attorney's fees are not to be assessed

against Appellant and by deleting the language from the bill of costs that "court appointed attorney fees may be added at a later date." *See Benavidez*, 423 S.W.3d at 522. We *affirm* the trial court's judgment *as modified*.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered March 31, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MARCH 31, 2021**

**NO. 12-20-00020-CR**

**JEREMY ALLEN MATHIS,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 349th District Court

of Anderson County, Texas (Tr.Ct.No. 349CR-15-32402)

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that the judgment of the court below should be modified and as modified, affirmed.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below be **modified** to delete the language from the bill of costs that "court appointed attorney fees may be added at a later date."; in all other respects the judgment of the trial court is **affirmed**; and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*